```
 1                  UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF TEXAS

 3                       HOUSTON DIVISION

 4   UNITED STATES OF AMERICA        .
                                     .  Criminal Action
 5   VERSUS                          .  No. H-09-CR-307
                                     .
 6   EHAB ASHOOR,                    .  Houston, Texas
                                     .  January 13, 2009
 7                                   .  10:41 a.m.
     Defendant.          .
 8   . . . . . . . . . . . . . . . .

 9              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE DAVID HITTNER
10                     AND A JURY

11   APPEARANCES:

12   FOR THE UNITED STATES OF AMERICA:

13          Mr. Jason Scott Varnado
            Mr. Gregg Jeffrey Costa
14          Assistant United States Attorneys
            UNITED STATES ATTORNEY'S OFFICE
15          910 Travis, Suite 1500
            Houston, Texas   77002
16          713.567.9617
            713.567.9345
17          FAX:  713.718.3300
            jason.varnado@usdoj.gov
18          gregg.costa@usdoj.gov

19   FOR THE DEFENDANT:

20          Mr. Erich C. Ferrari
            MC NABB ASSOCIATES, PC
21          1455 Pennsylvania Avenue, NW
            Suite 400
22          Washington, DC  20004
            202.280.6370
23          FAX:  202.318.8268
            ferrari@mcnabbassociates.com

24
                PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25       TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION
```

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1                        APPEARANCES

 2                        (continued)

 3  FOR THE DEFENDANT:

 4          Mr. Douglas C. McNabb
            MC NABB ASSOCIATES, PC
 5          Two Allen Center
            1200 Smith Street
 6          Suite 1600
            Houston, Texas   77002
 7          713.237.0011
            FAX:   713.583.1516
 8          mcnabb@mcnabbassociates.com

 9

10

11

12

13

14  COURT REPORTER:

15          GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8016
16          Houston, Texas   77002
            713.250.5582
17

18

19

20

21

22

23

24

25
```

1                              INDEX

2                                                              Page

3   CHARGE OF THE COURT                                          5
    GOVERNMENT'S CLOSING ARGUMENT BY MR. COSTA                  17
4   DEFENDANT'S CLOSING ARGUMENT BY MR. FERRARI                 39
    GOVERNMENT'S REBUTTAL ARGUMENT BY MR. VARNADO               63
5   JURY QUESTION NUMBER 1                                      74

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

January 13, 2010

THE COURT:  Good morning, ladies and gentlemen.  You have in front of you the instructions to the jury.  I want to thank the attorneys for working with me on this.  We were here well into the afternoon yesterday, and we got it wrapped up.

Each of you have a copy.  You may make whatever notes you need and take these with you, of course, at the end of the trial.  The official one has a blue back on it.  So when you reach your verdict, this is what the presiding juror will sign and return as the verdict in the case.

During this trial, you've heard me say, "Slow down, slow down."  Sometimes I pick up a little bit in speed because the court reporter has a full copy of what's in here, and I usually don't deviate from this except for, you know, clerical matters and things like that.

So as we -- as we go along, if you would, follow along.  Then each side has requested and I've given them 40 minutes to sum up the case.  And then once that's done, you know, we'll do our little drawing from our bowl; and then we'll proceed with the remaining 12 jurors; and then it will be your decision.

All right.  We're on page 2.

//

//

Gayle Dye, CSR, RDR, CRR - 713.250.5582

**CHARGE OF THE COURT**

1

2          THE COURT:   In any jury trial, there are, in effect,

3     two judges.  I'm one of the judges; the other is the jury.  It's

4     my duty to preside over the trial and to determine what

10:42:44   5     testimony is relevant under the law for your consideration.

6               It's also my duty at the end of the trial -- I

7     don't think we need this.  Somehow this has got a lot of volume

8     on it.  It's my duty to preside over the trial and to determine

9     what testimony and evidence is relevant under the law for your

10:43:02   10     consideration.

11               It's also my duty at the end of the trial to

12     explain to you the rules of law that you must follow and apply

13     in arriving at your verdict.  First, I'll give you some general

14     instructions which apply in every case, for example,

10:43:15   15     instructions about burden of proof and how to judge the

16     believability of witnesses.

17               Then I'll give you some specific rules about this

18     particular case; and finally, I'll explain to you procedures

19     that you should follow in your deliberations.

10:43:30   20               You, as jurors, are jurors of the facts; but in

21     determining what actually happened in this case, that is, in

22     reaching your decision as to the facts, it's your sworn duty to

23     follow all of the rules of law as I explain them to you.

24               You'll have no right to disregard or give special

10:43:48   25     attention to any one instruction or to question the wisdom or

1   correctness of any rule I may state to you.  You must not

2   substitute or follow your own notion or opinion as to what the

3   law is or ought to be.  It's your duty to apply the law as I

4   give it to you regardless of the consequences.

10:44:07   5          It's also your duty to base your verdict solely

6   upon the testimony and evidence in the case without prejudice or

7   sympathy.  That was the promise you made and the oath you took

8   before being accepted by the parties as jurors in this case, and

9   they have the right to expect nothing less.

10:44:24   10          The indictment, or formal charge, against the

11   Defendant is not evidence of guilt.  Indeed, the Defendant is

12   presumed by the law to be innocent.  The law does not require a

13   Defendant to prove his innocence or produce any evidence at all,

14   and no inference whatsoever may be drawn from the election of

10:44:43   15   the Defendant not to testify.

16          The Government has the burden of proving him

17   guilty beyond a reasonable doubt; and if it fails to do so, you

18   must find him not guilty.  Thus, while the Government's burden

19   of proof is a strict or heavy burden, it's not necessarily that

10:44:59   20   -- necessary that the Defendant's guilt be proved beyond all

21   possible doubt.  It's only required that the Government's proof

22   exclude any reasonable doubt concerning the Defendant's guilt.

23          A reasonable doubt is a real doubt based upon

24   reason and common sense after careful and impartial

10:45:17   25   consideration of all the evidence in the case.  Proof beyond a

1  reasonable doubt, therefore, is proof of such a convincing

2  character that you would be willing to rely and act upon it

3  without hesitation in the most important of your own affairs.

4         As I told you earlier, it's your duty to

10:45:36  5  determine the facts.  In doing so, you must consider only the

6  evidence presented during the trial, including the sworn

7  testimony of the witnesses and the exhibits.

8         Remember that any statements, objections, or

9  arguments made by the lawyers are not evidence.  The function of

10:45:51  10  the lawyers is to point out those things that are most helpful

11  to their side of the case and in so doing to call your attention

12  to certain facts or inferences that might otherwise escape your

13  notice.  In the final analysis, however, it's your own

14  recollection and interpretation of the evidence that controls in

10:46:09  15  the case.

16         What the lawyers say is not binding upon you.

17  Also, during the trial, I occasionally make comments to the

18  lawyers or ask questions of a witness or admonish a witness

19  concerning the manner in which he should respond to the

10:46:23  20  questions of counsel.

21         Do not assume from anything I may have said or

22  done during the trial that I have any opinion concerning any of

23  the issues in this case.  Except for my instructions to you on

24  the law, you should disregard anything I may have said during

10:46:38  25  the trial in arriving at your own findings as to the facts.

1          While you should consider only the evidence in

2     the case, you are permitted to draw such reasonable inferences

3     from the testimony and exhibits as you feel are justified in the

4     light of common experience.  In other words, you may make

5     deductions and reach conclusions which reason and common sense

6     lead you to draw from the facts which have been established by

7     the evidence.

8          In considering the evidence, you should not be

9     concerned whether the evidence is either direct or

10    circumstantial evidence.  Direct evidence is the testimony of

11    one who asserts actual knowledge of a fact, such as an

12    eyewitness.  Circumstantial evidence is proof of a chain of

13    facts and circumstances indicating that the Defendant is either

14    guilty or not guilty.  The law makes no distinction between the

15    weight you may give to either direct or circumstantial evidence.

16         I remind you that it's your job to decide whether

17    the Government has proved the guilt of the Defendant beyond a

18    reasonable doubt.  In doing so, you must consider all of the

19    evidence.  This does not mean, however, that you must accept all

20    the evidence as true or accurate.

21         You are the sole judges of the credibility or

22    believability of each witness and the weight to be given his or

23    her testimony.  An important part of your job will be to make

24    judgments about the testimony of the witnesses who testified in

25    this case.  You should decide whether you believe what each

1  person had to say and how important that testimony was.

2          In making that decision, I suggest that you ask

3  yourself a few questions:  Did the person impress you as honest?

4  Did the person have any particular reason not to tell the truth?

10:48:22  5  Did the witness have a personal interest in the outcome of the

6  case?  Did the witness have any relationship with either the

7  Government or the defense?  Did the witness seem to have a good

8  memory?  Did the witness have the opportunity and ability to

9  understand the questions clearly and answer them directly?  Did

10:48:41  10  the witness's testimony differ from the testimony of other

11  witnesses?  These are a few of the considerations that will help

12  you in determining the accuracy of what each witness said.

13          Your job is to think about the testimony of each

14  witness you have heard and decide -- and to decide how much you

10:48:59  15  believe of what each witness had to say.  In making up your mind

16  in reaching a verdict, do not make any decision simply because

17  there were more witnesses on one side than on the other.  Do not

18  reach a conclusion on a particular point just because there were

19  more witnesses testifying for one side on that point.

10:49:20  20          During the trial, you heard the testimony of

21  witnesses who have expressed opinions.  If scientific,

22  technical, or other specialized knowledge might assist the jury

23  in understanding the evidence or in determining a fact in issue,

24  a witness qualified by knowledge, skill, experience, training,

10:49:36  25  or education may testify and state an opinion concerning such

1   matters.

2              Merely because such a witness has expressed an

3   opinion does not mean, however, that you must accept this

4   opinion.  You should judge such testimony like any other

10:49:51   5   testimony.  You may accept it or reject it and give it as much

6   weight as you think it deserves considering the witness's

7   education and experience, the soundness of the reasons given for

8   the opinion, and all other evidence in the case.

9              You've heard evidence of acts of the Defendant

10:50:13   10   which may be similar to those charged in the indictment but

11   which were committed on other occasions.  You must not consider

12   any of this evidence in deciding if the Defendant committed the

13   acts charged in the indictment; however, you may consider this

14   evidence for such other very limited purposes.

10:50:32   15              If you find beyond a reasonable doubt from other

16   evidence in this case that the Defendant did commit the acts

17   charged in the indictment, then you may consider evidence of

18   similar acts allegedly committed on other occasions to determine

19   whether the Defendant had the state of mind or intent necessary

10:50:51   20   to commit the crimes charged in this indictment or whether

21   Defendant had a motive or opportunity to commit the acts charged

22   in the indictment, whether Defendant acted according to a plan

23   or in preparation for commission of a crime, whether Defendant

24   committed the acts for which he is on trial by accident or

10:51:13   25   mistake.  These are the limited purposes for which any evidence

 1  of other similar acts may be considered.

 2              You're here to decide whether the Government has

 3  proved beyond a reasonable doubt that the Defendant is guilty of

 4  the crime charged.  The Defendant is not on trial for any act or

10:51:32  5  conduct or offense not alleged in the indictment.  Neither are

 6  you concerned with the guilt of any other person or persons not

 7  on trial as a Defendant in this case.

 8              You will note that the indictment charges that

 9  the offense was committed on or about a certain date.  The

10:51:49  10  Government does not have to prove that the crime was committed

11  on that exact date so long as the Government proves beyond a

12  reasonable doubt that the Defendant committed the crime on a

13  date reasonably near the date stated in the indictment.

14              The word "knowingly," as that term is being used

10:52:07  15  -- I say has been used, it may be used later.  Anyhow, the word

16  "knowingly," as the term has been used from time to time in

17  these instructions means that the act was done voluntarily and

18  intentionally and not because of mistake or accident.

19              If a Defendant is found guilty, it will be my

10:52:27  20  duty to decide what the punishment will be.  You should not be

21  concerned with punishment in any way.  It should not enter your

22  consideration or discussion.

23              All right.  We're on page 16.  Count 1,

24  trafficking in counterfeit goods.  Title 18, United States Code,

10:52:53  25  Section 2320 makes it a crime for anyone to traffic in

1  counterfeit goods.  For you to find the Defendant guilty of this

2  crime, you must be convinced that the Government has proved each

3  of the following beyond a reasonable doubt:

4          that the Defendant trafficked or attempted to

10:53:11  5  traffic in goods;

6          that such trafficking or the attempt to traffic

7  was intentional;

8          that the Defendant used a counterfeit mark on or

9  in connection with such goods;

10:53:27  10          and that the Defendant knew the mark so used was

11  counterfeit.

12          The term "traffic" means to transport, transfer,

13  or otherwise dispose of to another for purposes of commercial

14  advantage or private financial gain or to make, import, export,

10:53:50  15  obtain control of, or possess with intent to so transport,

16  transfer, or otherwise dispose of.

17          The term "intentional" means the Defendant

18  intended to traffic in goods.

19          A trademark is any word, name, symbol, or device

10:54:06  20  or any combination thereof that is used to identify and

21  distinguish goods and to indicate the source of the goods.

22          A counterfeit mark is a mark used in connection

23  with trafficking in goods or services that is identical with or

24  substantially indistinguishable from a mark registered for those

10:54:30  25  goods or services on the principal register in the United States

1    Patent and Trademark Office and in use, whether or not the

2    Defendant knew such mark was so registered, and the use of which

3    is likely to cause confusion, to cause mistake, or to deceive.

4            The guilt of a Defendant in a criminal case may

10:54:53   5    be established without proof that the Defendant personally did

6    every act constituting the offense alleged.

7            We're talking now on page 18, aiding and

8    abetting, pursuant to 18, United States Code, Section 2.

9            Once again, the guilt of a Defendant in a

10:55:13   10   criminal case may be established without proof that the

11   Defendant personally did every act constituting the offense

12   alleged.

13           The law recognizes that ordinarily anything a

14   person can do for himself may also be accomplished by him

10:55:28   15   through the direction of another person as his agent or her

16   agent or by acting in concert with or under the direction of

17   another person or persons in a joint effort or enterprise.

18           If another person is acting under direction of

19   the Defendant or if the Defendant joins another person and

10:55:49   20   performs acts with the intent to commit a crime, then the law

21   holds the Defendant responsible for the acts and conduct of such

22   other person just as though the Defendant had committed the acts

23   or engaged in such conduct.

24           Before any Defendant may be held criminally

10:56:10   25   responsible for the acts of others, it's necessary that the

1    accused deliberately associate himself in some way with the

2    crime and participate in it with the intent to bring about the

3    crime.

4            Of course, mere presence at the scene of a crime

10:56:24    5    and knowledge that a crime is being committed are not sufficient

6    to establish that a Defendant either directly -- or either

7    directed or aided and abetted the crime unless you find beyond a

8    reasonable doubt that the Defendant was a participant and not

9    merely a knowing spectator.

10:56:43   10            In other words, you may not find any Defendant

11   guilty unless you find beyond a reasonable doubt that every

12   element of the offense as defined in these instructions was

13   committed by some person or persons and that the Defendant

14   voluntarily participated in its commission with the intent to

10:57:00   15   violate the law.

16            For you to find the Defendant guilty of this

17   crime, you must be convinced that the Government has proved each

18   of the following beyond a reasonable doubt.  We're talking now

19   about aiding and abetting based upon the instructions I just

10:57:15   20   gave you.

21            First, that the person -- that the offense of

22   trafficking in counterfeit goods was committed by some person;

23            that the Defendant associated with the criminal

24   venture;

10:57:26   25            that the Defendant purposely participated in the

1  criminal venture;

2          and that the Defendant sought by action to make

3  that venture successful.

4          To associate with the criminal venture means that

10:57:40  5  the Defendant shared the criminal intent of the principal.  This

6  element cannot be established if the Defendant had no knowledge

7  of the principal's criminal venture.

8          To participate in the criminal venture means that

9  the Defendant engaged in some affirmative conduct designed to

10:57:58  10  aid the venture or assisted the principal of the crime.

11          To reach a verdict, whether it's guilty or not

12  guilty, you all must -- all of you must agree.  Your verdict

13  must be unanimous as to each count of the indictment.  Your

14  deliberations will be secret.  You'll never have to explain your

10:58:21  15  verdict to anyone.

16          It's your duty to consult with one another and to

17  deliberate in an effort to reach agreement, if you can do so.

18  Each of you must decide the case for yourself only after an

19  impartial consideration of the evidence with your fellow jurors.

10:58:34  20          During your deliberations, do not hesitate to

21  reexamine your own opinions and change your mind if convinced

22  you're wrong.  But do not give up your honest beliefs as to the

23  weight or effect of the evidence solely because of the opinion

24  of your fellow jurors or for the mere purpose of returning a

10:58:52  25  verdict.

1                     Remember at all times you're judges, judges of

2       the facts.  Your sole interest is to seek the truth from the

3       evidence in the case, to decide whether the Government has

4       proved the Defendant guilty beyond a reasonable doubt.

10:59:04  5                     When you go to the jury room, the first thing you

6       do is to select one of your number as your foreperson who will

7       help guide your deliberations and will speak for you here in the

8       courtroom.

9                     A form of the verdict has been prepared for your

10:59:16  10      convenience.  The foreperson will write the unanimous answer of

11      the jury in the space provided for each count of the indictment,

12      either guilty or not guilty.  At the conclusion of your

13      deliberations, the foreperson should date and sign the verdict.

14                     If you need to communicate with me during your

10:59:34  15      deliberations, the foreperson should write the message and give

16      it to the marshal.  I will either reply in person or bring you

17      back into the court to answer your message.

18                     Bear in mind that you're never to reveal to any

19      person, not even to the Court, how the jury stands numerically

10:59:50  20      or otherwise on any count of the indictment until after you've

21      reached a unanimous verdict.

22                     The last page is the verdict form.  It states we,

23      the jury, return the following as our unanimous verdict on Count

24      1.  And then put the appropriate mark, either guilty or not

11:00:08  25      guilty, in one of those blanks.  It needs to be dated and signed

1   by the presiding juror, at which time you'll notify the marshal

2   that you've reached a verdict.

3          I'm going to start the clock.  Keep in mind the

4   Government is going to reserve a little bit of its time to wrap

11:00:25   5   up.

6          All right.

7          MR. COSTA:  May I proceed, your Honor?

8          THE COURT:  Are you ready?

9          MR. COSTA:  Yes.

11:00:27  10          THE COURT:  Go right ahead.

11          MR. COSTA:  Thank you, your Honor.

12          Good morning.  You've now seen the evidence that

13   proves beyond a reasonable doubt that Mr. Ashoor trafficked in

14   counterfeit Cisco goods and that he knew those goods were

11:01:01  15   counterfeit.

16          Taking you back to opening argument -- opening

17   statement on Monday, we told you that the evidence would show

18   Mr. Ashoor promised the Marines to provide genuine Cisco parts.

19   You saw that evidence during the trial.  The contract itself

11:01:20  20   twice says -- first line, these items must be genuine Cisco

21   products.  Again, these items must be genuine Cisco GBICs.

22          You also saw that the sergeant, the contracting

23   sergeant, Sergeant Britton, e-mailed him, emphasized that they

24   need to be genuine Cisco.  He confirmed that they would be.

11:01:45  25          So Mr. Ashoor from the beginning was aware to be

1    on the lookout for counterfeit Cisco parts.  This wasn't

2    something that never even entered his mind.  He knew that it was

3    something to focus on and to be vigilant about.

4              The next thing we told you in opening statement

11:01:57   5    is that Mr. Ashoor knew how to obtain legitimate Cisco parts.

6    He wasn't someone just off the street who doesn't know anything

7    about Cisco.  He had a history.  He had been involved in the

8    Cisco-authorized network.  He had been kicked out for buying

9    outside that network, and he was trying to rejoin it in 2008.

11:02:12  10              So he knew that, if you wanted to buy products

11    and get an assurance that they were genuine, you can go through

12    the network; and he also was familiar with what the prices

13    should be.

14              We also told you that what happened instead was

11:02:25  15    that Ashoor knowingly purchased counterfeit goods from China.

16    And you saw the e-mails he had with Vivian from the company in

17    China, and she never advertised those as genuine Cisco products.

18    He had to tell her "We need Cisco brand GBICs.  We need Cisco

19    packaging."

11:02:45  20              He throws Cisco into the conversation.  They

21    weren't advertised that way.  They weren't represented that way.

22    She never said they were genuine Cisco parts.  He knowingly

23    bought those parts as counterfeit goods.

24              And why did he do it?  We told you that he was

11:03:01  25    going to make a profit of over 2,000 percent, which anyone in

1   the business world knows is virtually unheard of; and that 2,000

2   percent profit was going to be at the expense of the Marine

3   Corps and, of course, ultimately at the expense of the

4   taxpayers.

11:03:19   5   Now, the judge discussed the four elements -- he

6   just read those instructions, and you have them in your hands --

7   the four elements that the Government needs to prove beyond a

8   reasonable doubt.  I want to walk through those four, and my

9   discussion with you is going to focus on the evidence that

11:03:34   10   proves those four elements.

11   The first element is that the Defendant

12   trafficked or attempted to traffic in goods.  And the definition

13   of trafficking, which the judge read to you and you have there,

14   says trafficking means a number of things, it can be satisfied a

11:03:50   15   number of ways.  Just by transferring or transporting or in this

16   case importing, the Defendant is trafficking in goods.

17   And I think the evidence is clear that he had

18   those -- that he caused those goods to be imported from China

19   into the United States.

11:04:05   20   The second element is that such trafficking or

21   the attempt to traffic was intentional.  And again, in these

22   first two elements, we're not talking anything about the

23   counterfeit aspects yet, just talking about trafficking in

24   goods.

11:04:16   25   And clearly, the trafficking was intentional.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   That's why he bought them from China, to have them sent over to

2   him in Houston and, ultimately, have them sent on to the Marines

3   in Iraq.  So clearly, he intended for these goods to be

4   imported, to be transported.

11:04:32   5              The third element:  that the Defendant used a

6   counterfeit mark on or in connection with such goods.  What are

7   the counterfeit marks?  The name Cisco itself, just the name

8   Cisco, like the name Coca Cola or McDonald's, is a trademark.

9   So just by him saying these need to be Cisco products and make

11:04:50   10   sure they have Cisco packaging, he's the one directing that the

11   package have Cisco on it.

12              Vivian in China never said that.  He directed her

13   to do that.  They made a big point, "Oh, he never saw the

14   products."  But he's the one saying they have to be Cisco

11:05:04   15   packaging; and of course, he knew they had to be in Cisco

16   packaging because he wanted the Marines to think they were real.

17   They had to show up at the Marines in genuine Cisco packaging or

18   what appeared to be that Cisco packaging.

19              And fourth, that the Defendant knew that the mark

11:05:21   20   used was counterfeit.  And of course, if the product itself is a

21   counterfeit product, then the label being put on it is

22   counterfeit.  And I think this fourth element -- I'm going to

23   spend most of my time, as I walk through this, on that fourth

24   element because I think that's where the defense's main argument

11:05:37   25   is going to be, about the Defendant's knowledge.

1          Because, of course, Defendants don't say, "Oh,

2     yeah, I know it's counterfeit" and they don't e-mail their

3     sellers and say, "I want counterfeit products."  They don't do

4     that.  So you have to look at a whole host of factors in

11:05:51  5     determining and showing the Defendant's knowledge that these

6     were counterfeit parts.

7          And I'm going to talk about a dozen reasons,

8     pieces of evidence we saw during this trial that when you add

9     them all up make it clear beyond any reasonable doubt that he

11:06:07 10     knew they were counterfeit products.

11          These are things like the e-mails we saw, these

12     are things like the price that not in and of themselves

13     establish that but when you add them together, which is your

14     duty, to go back there and look at all the evidence together and

11:06:22 15     come up with your determination.

16          First, I do want to spend a little more time on

17     these first three elements just to make sure we're clear on

18     that.  The definition of trafficking, which is Element 1, again,

19     to transport, transfer.  It goes on.  Another thing, import.  I

11:06:38 20     think import is the clearest cut in this case.  He had them

21     imported from China into the United States at his direction.

22          And don't get caught up on the fact that he

23     didn't walk into the post office in China and say, "Here, put

24     this in the mail."  You remember that last part of the

11:06:52 25     instructions the judge read to you, the aiding and abetting?  It

says he doesn't have to be the one to physically put them into

the mail.  If he directs someone to do it, if he knows about it;

and he was the main cause those products were sent into the

United States.  I don't think there's any doubt that he -- there

was trafficking in this case.

And there's the shipping label.  At his

direction, he says, "Mail them to me in Houston."  And there you

see they were being sent from China.  No dispute about that; and

of course, his whole -- his whole goal is he was attempting to

ultimately transfer these to the Marines in Iraq.

So those are the first two elements.  There was

trafficking; and of course, he intended for the trafficking.

That just means he intended for them to be shipped to him,

imported into the United States.

And again, with those first two elements, this

whole issue of counterfeiting doesn't even come up yet.  That's

the third and fourth elements, which I want to turn to now.

Ashoor knowingly used a counterfeit mark.  Well,

first of all, what is a counterfeit mark?  It's a mark used in

connection with goods that is either identical with or

substantially indistinguishable from a registered trademark; and

someone looking at that, a consumer, the Marines who were buying

it, it's something that would likely cause someone to be

confused, to cause mistake, or to deceive that person into

thinking that it is a real trademark because it's either the

1    same or virtually indistinguishable.

2              And again, it was Mr. Ashoor -- he didn't put the

3    label on the product.  We're not saying that, of course.  But

4    again, on that aiding and abetting, if he's directing that to be

11:08:30  5    done, he's just as guilty as if he had put it on there himself.

6              And this e-mail, Vivian, what -- she had asked

7    "What will be packing for these items?"  "We need these

8    individual 200 pieces in a Cisco sealed plastic bag."  And

9    notice he has Cisco in all capital letters because he knows that

11:08:52  10    Cisco is an important name and he knows that that's how Cisco is

11    always spelled on products, all capital letters.

12              And again, just that name Cisco itself, just the

13    name, can be a trademark; and it is, in fact, the registered

14    trademark name for Cisco.  And per his instructions, it's placed

11:09:11  15    onto those bags.

16              There's the name Cisco on those silver antistatic

17    bags that you remember seeing that were in this box.  Done at

18    his request.  He certainly knew about it.  He knows the mark is

19    being put on those goods even though he himself isn't sticking

11:09:28  20    it on there.

21              The other mark you saw, another trademark, is a

22    logo, the bridge, that goes with Cisco Systems; and you saw the

23    same thing on the static bag.  Again, at his request.  He's

24    saying, "We need to make these look like Cisco packaging."

11:09:43  25    Vivian didn't bring that up, he did.

1          The whole goal -- and of course, he has to know

2  that marks are being used because the whole goal is to make it

3  look to the Marines like these are real goods.  If the Marines

4  see -- if it doesn't say Cisco on there, the Marines are going

11:09:56  5  to know it's not legitimate goods.

6          And you saw evidence that the goods were, in

7  fact, counterfeit.  We had two engineers testify from the

8  companies that manufacture these from Cisco.

9          First, Mr. Zhao, you'll remember, he was the

11:10:12  10  Finisar engineer, two master's degrees.  And he talked about the

11  hundred parts, ten of which he tested, that his company

12  manufactured.  He said, first of all, for all ten of them, the

13  serial numbers do not exist in the database; and any product

14  that runs off of their assembly line is going to have a serial

11:10:33  15  number that gets registered.

16          He also told you about that internal memory

17  number that should match up.  It's an internal chip.  When he

18  ran that for all ten, the numbers showed it was not -- it didn't

19  match up so he knew it was not a genuine part.

11:10:47  20          And then you'll remember he talked about

21  differences on the outside.  He talked about differences, when

22  he opened it up, on the inside.  He said no doubt, no doubt

23  these are non-genuine.  They're counterfeit goods.  And you'll

24  remember he said this was an obvious case.  Not even a close

11:11:01  25  call like they are sometimes when he examines these things.  And

1  there's the pictures.  He showed you an example.

2              You heard similar testimony from Ms. Barraza with

3  Avago.  She talks about the labels.  Again, she also checked

4  that internal memory that's embedded.  Basically, she says if

11:11:17  5  that internal memory doesn't show it to be genuine, it's not

6  genuine; and she pointed out a whole number of differences.

7              And she also said no doubt -- she's an expert

8  engineer -- no doubt these are all non-genuine.  And again, the

9  pictures.  And you know, the reason we presented those two

11:11:34  10  witnesses, we wanted you to see the differences.

11              You'll remember they talked about that soldering.

12  It's just done by wire on the ones Mr. Ashoor purchased.  Didn't

13  have that shield on there.  And they talked about some of the

14  problems.  It's inferior quality.  It's more likely to cause

11:11:51  15  electrical shorts which would cause the whole part to

16  malfunction.

17              We wanted you to see those differences, and we

18  wanted you to understand that these are inferior products and

19  the risk that comes with that.

11:12:04  20              But Mr. Ferrari says, "Well, he never had the

21  chance to open them up.  He never had the chance to look at

22  those."  Well, of course, we're not saying Mr. Ashoor ever saw

23  the inside of these.  What we do know is that from all the

24  e-mails, all of the -- the fact of the price he paid, all of the

11:12:20  25  circumstantial evidence in this case, that he knew the parts

1   were counterfeit.

2            And that is what I want to spend the rest of my

3   time talking about because I do think that is the main argument

4   the defense has in this case.

11:12:32   5            And you know, the defense asked a lot of

6   questions, "Well, can you be sure just because it came from

7   China?  Can you be sure just because of the price?  Can you be

8   sure, you know, just because of that e-mail?"

9            And the issue in this case isn't whether each one

11:12:47   10  of those pieces of evidence on its own satisfies the

11  Government's burden.  The issue is whether all of that evidence,

12  when you consider it in its entirety, which is what your duty is

13  when you go back there, whether all of that evidence establishes

14  his knowledge and his guilt in this case.

11:13:05   15           And I think a helpful way to think about it is

16  that each piece of evidence is just one piece of the puzzle.

17  And we're not saying, "Oh, here's this one e-mail, this is one

18  piece of the puzzle and this alone finds him guilty."  That's

19  not what we're asking.

11:13:18   20           What we're saying is take all those puzzle pieces

21  and when you go back there, fit them all together because, when

22  you do fit all those pieces together -- and I'm going to talk

23  about approximately a dozen of those puzzle pieces -- when you

24  put them all together, there's one clear unmistakable picture:

11:13:35   25  that Mr. Ashoor knew that these were counterfeit products.

1           The first piece of the puzzle:  The Marine Corps
2   put Ashoor on notice to be looking out for counterfeit Cisco
3   goods.  We talked about this a little bit at the beginning of my
4   -- of this discussion.  There's that contract twice saying they
5   must be genuine Cisco, not only is this a quality issue, it is a
6   possible security issue.

7           And you heard from Marine Sergeant Chieffalo why
8   that is.  They send intelligence over these computer networks.
9   The network is used for their security at the base.  The network
10  is used to communicate with Marines out in the field who may be
11  in combat.

12          And you heard the problems they had, even an
13  example of a computer part where an embedded chip was relaying
14  information back to the Chinese army.  So he knew that danger.
15  He knew to be vigilant, to be making sure these were genuine
16  parts and not just in the contract, in his e-mails with Sergeant
17  Britton.

18          "Lastly" -- this is Sergeant Britton "I want to
19  confirm that you quoted on genuine Cisco products."  And what
20  does he say, Mr. Ashoor?  "This is to confirm we quoted only
21  brand new genuine Cisco products as requested in bid."  So from
22  the very beginning, he's got on his mind that these need to be
23  genuine.  This issue is on his mind.  That's the first piece of
24  the puzzle.

25          And what happens right after he gets the contract

1  inked with the Marines, the very end of June?  The first thing

2  he does, the first person he contacts to try to fill this order

3  is Arbitech.  And it's apparent from the e-mail, which is in

4  Exhibit 15, that he dealt with Arbitech before.  He knew these

11:15:18  5  folks.  And you heard the agents say that Arbitech is known to

6  traffic and sell counterfeit goods.

7          And he tells Arbitech, "Can you help me fill this

8  order for the Marines?"  And what's Arbitech's response?  "Cisco

9  is risky selling to the government due to rep involvement."

11:15:33  10  That's a misspelling but involvement.  Well, if these are

11  genuine goods, what's the risk?  If they're real goods that

12  Mr. Ashoor is looking at buying from Arbitech, why risk it?  The

13  real deal is the real deal.  There's no risk if it's genuine.

14          So the fact that his -- the first people he goes

11:15:52  15  to are telling him "We don't want to have anything to do with

16  this deal because Cisco is risky selling to the government,"

17  that shows Mr. Ashoor's -- his involvement with counterfeiters

18  and the fact that, once again, he's warned it's risky when

19  you're selling to the government.

11:16:07  20          That very same day -- these are both on June

21  30th, Monday, June 30th.  That's at about 1:00 clock.  The next

22  e-mail, the third piece of the puzzle, is at 2:30.  So after

23  Arbitech says, "No, we don't want to get involved.  We don't

24  want to get involved if the government's involved," he e-mails

11:16:23  25  this Jason Sun asking him for a price quote.

1          Sun responds, "Sorry.  And you should be aware
2    that all the Cisco parts you bought from China and Hong Kong
3    sellers are not original."  One of the key pieces of evidence in
4    this case.  That is direct evidence of someone telling him "You
11:16:41   5    buy from China and Hong Kong sellers, it's not original."
6    Direct knowledge right at the beginning of his attempt to try
7    and fill this order.
8          I think the defense asked some questions, "Well,
9    did Ms. Vivian over in China ever say, 'By the way, what I'm
11:16:57  10    sending you is counterfeit?'"  And the answer is, no, she
11    didn't.  But even better than that, he knows from the beginning,
12    someone's telling him China and Hong Kong sellers are not
13    original.
14          What does he do anyway?  He ends up buying them
11:17:14  15    from China, and he knows these are coming from China.  It's the
16    fourth piece of the puzzle.  He's wiring money to this bank in
17    China, Shenzhen branch.  There's the wiring instructions.  He's
18    communicating with Vivian in China.  Remember he sends the
19    e-mail to his partner saying, "This is a China vendor."  He
11:17:32  20    knows they're coming from China.
21          And I don't want it to be confused because there
22    was some testimony that not these parts but there are some parts
23    that get made -- real parts get made in China, maybe components
24    of the parts get made in China; but then those go through the
11:17:46  25    factories and go through the normal distribution channels for

1  those companies like Cisco.

2          What they're talking about here, what he was told

3  in this e-mail is that people selling out of China and Hong Kong

4  are not original.  And you remember the Customs inspector,

11:18:00  5  Mr. Nugent, said he's come across about 50 or 60 mail packages

6  in his time that were trying to send parts that had Cisco labels

7  on them from China; and he would send it off to Cisco to see if

8  it was legitimate.  Every single time, they came back as

9  counterfeit.

11:18:17  10          And Mr. Ashoor did know -- he knew the same thing

11  because he's being told China and Hong Kong sellers are not

12  original.  A critical piece of the puzzle.  But again, still

13  just one piece to consider along with everything else.

14          Number 5, Mr. Ashoor purchased these goods

11:18:34  15  outside the Cisco distribution network.  And I want to be real

16  clear on this.  I tried to be in opening.  Mr. Ferrari is still

17  making a big issue of this.  We are not saying that buying parts

18  outside the network is a crime.  That's between Mr. Ashoor and

19  Cisco.  It's not a crime in and of itself.

11:18:54  20          The importance of it, though, is, again, that he

21  has knowledge.  He's not someone just off the street.  You might

22  have walked in here Monday and not known the first thing about

23  Cisco parts or how you get them.  That's not Mr. Ashoor, and you

24  need to judge this evidence from someone like Mr. Ashoor who has

11:19:09  25  a history with the Cisco network.

1          And you heard the testimony about the network and
2     how he had been a registered partner; and the deal is, if you're
3     a registered partner, you're giving your word that you're going
4     to buy from an authorized distributor.  That way when people end
11:19:24   5     up with the products, they have some assurance they're genuine,
6     they can get service by Cisco; and you heard that Mr. Ashoor
7     broke his word and he was kicked out of the program back in
8     2004.
9          But again, he also notes how important it is to
11:19:38   10    be part of that program because in the summer of 2008 when he's
11    trying to fill this order, he applies again; and he represents
12    to the Marines, to Sergeant Britton, that he is a registered
13    Cisco seller.  He wasn't even approved yet, but he represents
14    that.
11:19:54   15         And again, the fact that he has to represent that
16    to the Marines, is he saying it doesn't matter?  If Mr. Ferrari
17    is going to get up there and say this matters nothing, why tell
18    Sergeant Britton that?  And especially stretch the truth and say
19    "I'm already registered" when he, in fact, wasn't approved yet.
11:20:13   20         He knows how to get the goods; and he knows if
21    you want legitimate goods that you can be assured of, which is
22    what the Marines wanted, they wanted assurances, they made that
23    clear, he knew how to go about doing that; but he didn't do it.
24         Number 6 -- and these next few are all different
11:20:26   25    e-mails between Mr. Ashoor and Ingellen, the person -- the

1    seller in China.  And often times in trial, it's things that

2    seem like small details at first that end up being the most

3    telling evidence of a Defendant's guilt; and I think that's

4    especially true in a brief trial like this one.

11:20:45   5            These e-mails go up on the screen.  There's a lot

6    of paper going up over the last couple of days.  And sometimes

7    the importance of that evidence isn't clear at first blush, and

8    that's part of our job in closing argument is to highlight why

9    some of that evidence is important.  And of course, your job,

11:21:00  10   when you go back there and deliberate, is to look at the

11   evidence -- you'll have this back there with you -- look at the

12   evidence, focus on the details.  And when you're looking at it,

13   think it through.  What makes sense?  Use your reason.  Use your

14   common sense.

11:21:13  15            And I think Number 6 is an example of that.  This

16   also takes us back to opening argument on Monday.  One of the

17   things Mr. Ferrari emphasized at the very beginning, he said,

18   "My client was misled.  He was -- this woman in China, she

19   represented to him that these were genuine Cisco parts"; that

11:21:35  20   she misrepresented that, he was misled, he was duped.

21            Ladies and gentlemen, you've now seen the

22   evidence, and that is simply not true.  Ingellen, or Vivian,

23   never represents that those parts are genuine Cisco goods.

24   Never.  First, this is the advertisement on Ebay.  What does it

11:21:57  25   say?  Title:  "10 pieces new bulk WS-G5486 1,000 base LX GBIC

1  transceivers."  The word "genuine" is not in there.  The word
2  "Cisco" is not in there.
3             Here's the invoice.  The key document in a
4  typical transaction is the invoice, and that's the legal
11:22:18  5  document if you want to challenge the sale.  Nowhere on that
6  invoice -- go back and look at it -- does it say "Cisco" or does
7  it say "genuine."
8             Who is it that brings Cisco into the
9  conversation?  And if you look at -- I'll mention one more
11:22:32 10  thing.  Exhibit 14 is all the e-mails between Mr. Ashoor and
11  Vivian.  Look through that entire e-mail chain.  Never in there
12  does she say these are genuine Cisco parts.  And just as
13  importantly, never does he ask, never -- remember when the
14  Marines asked him "You're going to provide genuine parts,
11:22:50 15  right?"  He said, "Oh, yes, promise, genuine."
16             Never does he ask her "Are you going to guarantee
17  me that these are genuine Cisco parts?"  Never does.  Why not?
18  He knows they're fake.  Two weeks earlier he had been told by
19  Jason Sun that it's fake if it's coming from China.  Let's
11:23:07 20  continue with those e-mails.
21             Number 7 is how he actually throws Cisco into the
22  conversation.  And again, it's him, not -- not like Mr. Ferrari
23  said in opening argument, it's not Ingellen that's representing
24  these as genuine Cisco parts.
11:23:22 25             She says to him -- he's contacted her.  She says,

1    "Hello, dear friend.  Please tell me your exact order."

2             THE COURT:  Slow down, please.

3             MR. COSTA:  Yes, your Honor.

4                  "Hello, dear friend.  Please tell me your exact

11:23:34  5    order."  Nothing from Cisco from her.  "And which package do you

6    need?"  His response, "Thank you for the quick response.  We

7    have to order the following Cisco brand new GBICs."  And he

8    gives her the GLC part number, as well as the WS part number.

9                  He throws Cisco into the conversation.  And think

11:23:55  10   about this:  If they were Cisco to begin with, why wouldn't she

11   have advertised that?  If you see an advertisement, "Sneakers,

12   $20," would you call them up and say, "I want to buy those

13   sneakers for $20 and I want them to be Nike"?

14                 If they're Nikes -- Nike is a brand leader, just

11:24:09  15   like Cisco is a brand leader.  It's the best.  It's the most

16   expensive.  If they're Nike sneakers, they're going to say it in

17   the ad.  You don't call them up and tell them that.  Again, look

18   at this, use your common sense.  She never represents anything

19   to him about Cisco.  He's the one who brings Cisco into the

11:24:24  20   conversation and never asks her to guarantee that they're

21   genuine.

22                 Number 8 --

23             THE COURT:  You got -- 24 minutes has gone passed.

24             MR. COSTA:  Thank you, your Honor.

11:24:36  25                 Number 8, he has to specify not just that the

1   parts themselves are Cisco but that the packaging is Cisco.  And

2   we talked a little bit about this already.  He says, "We prefer

3   each GBIC to be in Cisco packaging."  I'll use the Nike example

4   again.

11:24:47   5          If you go to the shoe store, let's say you have

6   to try on the shoes, "Yeah, I'll take the Nikes," do you tell

7   them, "Oh, and I want them in a Nike box"?  If they're real,

8   they're coming in a Nike box.  You don't have to tell them that.

9   And if these are real Cisco parts, they're going to come in

11:25:03   10  Cisco packaging.  Why does he have to keep saying that?  He says

11  it a couple of times in those e-mails.

12          Number 9, he has to say not just that they're

13  Cisco packaging, then in a later e-mail he says they have to be

14  individually wrapped in Cisco sealed plastic bags; and he pays

11:25:21   15  extra.  And you saw Mr. Ashoor.  He's trying to get every penny

16  out of this he can, but he pays extra for individual wrapping.

17          Now, if they're real goods, why not just send

18  them all in one box with one big Cisco package?  Why do you want

19  them all wrapped individually?  And you saw them all.  Each one

11:25:39   20  is in this individual Cisco packaging per his instructions, not

21  Vivian's, because he knows they're not real and he wants it to

22  look as legit as possible.

23          If the Marines get a box with just one big Cisco

24  package and a bunch of parts thrown in there, it's not going to

11:25:56   25  look as real.  Now, if they were real, who cares?  There's

1   nothing to worry about.  But he knows they're fake.  So he has

2   to dress it up and make it look as good as possible, and he's

3   willing to pay extra to do that.

4            Number 10 is the price, and there's been a lot of

11:26:07   5   talk about that during the trial.  Again, he's aware of the

6   market price.  He didn't just come in off the street.  Not just

7   with his experience with Cisco; but another small detail, the

8   bid he submits, which averages out to about $600 a part,

9   remember, that's what the testimony from Cisco -- and other

11:26:26   10   evidence, that's about what the market price is.

11            It would enable them to make a little bit of

12   profit, which is typical.  He knew what these things should cost

13   just by the fact that his bid, in fact, reflected the market

14   price.  But instead, he pays five percent of it.  And I'll use

11:26:46   15   one more time the Nike example since most people are familiar

16   with shoes; and if you've had kids, you're probably aware about

17   how expensive they can be.

18            Let's say you want to buy some Nike shoes and you

19   go to some reputable dealers.  You go to Academy, you go to Foot

11:27:01   20   Locker.  Everyone is selling them for hundred bucks.  And then

21   you come across someone on the Internet or -- and the person

22   says, "I'll sell you those same shoes for five bucks that

23   everybody else is selling for hundred."  Would you think that

24   those five dollar priced shoes are legitimate Nike products?

11:27:18   25            I'm going to quote what Gunny Sergeant Britton

1  said:  "Hell no.  Sir."  And that's the same thing with

2  Mr. Ashoor.  He knew those prices.  Five percent -- a little

3  less than five percent.  He knew those goods were not genuine.

4              Similar to that is the profit.  It's not just

11:27:36  5  that the price was so low, it's the profit he was going to

6  realize.  Over 2,000 percent.  There's the math on that.  Anyone

7  familiar with business knows that is -- that is just not the

8  real world.  That's not a real legitimate deal to make a 2,000

9  percent profit.

11:27:50  10              Sometimes in business you can double your money,

11  hundred percent profit.  You make a real good deal, maybe you

12  can triple your money.  A 2,000 percent profit?  It's unheard

13  of.  As Sergeant Britton said, "Something is wrong with that."

14  And he knew, Mr. Ashoor knew, something was wrong with that.

11:28:07  15              Finally, the last key piece of evidence on how he

16  knew they were counterfeit:  He had the goods imported to the US

17  rather than sent directly to Iraq.  He ordered them on July

18  21st.  They're due in Iraq a week later on the 28th.  So there's

19  a time issue.  He also -- it's going to cost more to have them

11:28:26  20  routed through Houston because he has to pay for the shipping to

21  Houston and then pay again from Houston to Iraq.

22              Why does he want to do something that takes more

23  time and that costs more money?  You'll see he was haggling over

24  the shipping price with Ingellen.  He doesn't want to pay a lot

11:28:41  25  of shipping price.  But he was willing to do it because he knew

1  if the Marines got this raggedy box with a label that said Hong

2  Kong and with a company name that no one has ever heard of as an

3  authorized Cisco seller, the Marines are going to be on him.

4          But if it comes to Houston first, he can put them

5  in a nice box with his company's name and a Houston postmark on

6  it; and again, it will be a better way to fool the Marines.

7  Another small detail that actually tells you a whole lot about

8  his thinking and what he knew.

9          And what's his explanation when Agent Wickman

10  goes to arrest him?  And again, there's a lot of questions:  Why

11  didn't you arrest him the first day?  Why didn't you just -- you

12  know, wasn't he guilty the very first day?  Well, we did a

13  thorough investigation.

14          We're not in the business of just going and

15  arresting someone the first inkling we get of some information

16  that they might be involved in some crimes.  We did a thorough

17  investigation.  We wanted to see all this evidence we've shown

18  you.  Get the e-mails, get the financial records.  It was at

19  that point that we had the evidence to charge this case and to

20  bring it to you today with all those different pieces.

21          And what happened when Agent Wickman asked him

22  "Why did you do this from China at that price?"  His response:

23  "It was too low to pass up."  Well, ladies and gentlemen, you

24  know that it was also too good to be true.

25          When you go back there, put those puzzle pieces

11:28:56
11:29:11
11:29:25
11:29:40
11:30:03

1   together; and the only conclusion you'll draw:  those pieces are

2   going to form one picture, the picture that Mr. Ashoor

3   trafficked in goods.  He knew beyond a reasonable doubt -- you

4   can be sure he knew that they were counterfeit goods.

11:30:19   5         Follow that evidence.  Hold him accountable for

6   trafficking in those goods by having them imported into the

7   United States with the eventual plan of having those products go

8   to the Marines in Iraq, even though he knew that parts that

9   weren't genuine caused security problems for those Marines.

11:30:38   10         We ask that you find Mr. Ashoor guilty, and we

11   thank you for your attention during this trial and for your

12   service.

13         THE COURT:  Okay.  You've used about 30 and one-half

14   minutes.

11:30:54   15         Defense, you're up.

16         MR. FERRARI:  Thank you, your Honor.

17         Good morning, ladies and gentlemen of the jury.

18         Too good to pass up and too good to be true.

19   Does that mean too good to be authentic?  Is that what we're

11:31:09   20   looking at?

21         The Government brought up the issue of an e-mail

22   from Jason Sun.  Let's go back and take a look at that e-mail.

23   This is the e-mail here.  It's a Government exhibit.  It's not a

24   defense exhibit.

11:31:24   25         Now, this is the e-mail that they introduced on

1    direct testimony with Agent Wickman on the stand.  This is the

2    e-mail that I brought up on cross examination; then they brought

3    it up on redirect; then I brought it up on recross; and then

4    they brought it up one more time.  Take a second and read the

5    e-mail, please.

6              From Ehab, "Hello.  I saw you on Ebay.  Please,

7    can you provide us a price quote on the following Cisco genuine

8    only, including air shipment, to Houston, Texas."  Then look who

9    wrote the response:  Jason Sun, networking-sales@hotmail.com.

10   "Sorry, you should be aware that all the Cisco parts you bought

11   from China and Hong Kong sellers are not original.  All these

12   parts are made by a third party.  Thanks."  Jason Sun,

13   networking-sales@hotmail.com, said that Mr. Ashoor should know

14   that these goods are counterfeit because they're coming from

15   China.

16             The Government's expert witnesses from Finisar

17   Corporation and from Avago, the companies that actually

18   manufacture genuine GBICs, said -- well, in the case of Mr. Zhao

19   from Finisar said that the components that they used to assemble

20   these products come from China.

21             Ms. Barraza from Avago said they actually

22   manufacture some Cisco products in China.  I guess Jason Sun

23   didn't get the memo.  Who are we supposed to believe, the

24   experts from the companies who manufacture these genuine GBICs

25   or from networking-sales@hotmail.com?  Are we supposed to

1  believe the Government's experts, their own experts, not the

2  defense's experts, the Government's experts, or do we believe

3  the guy who has a hotmail account?  I won't tell you one way or

4  the other.  I'll let you make that decision on your own.

11:33:26  5          They brought up a lot about e-mails.  And they

6  believe that you can draw the inference that Mr. Ashoor was

7  looking for counterfeit or directing people to ship him

8  counterfeit products because he asked them to be Cisco.  Are you

9  telling me that Cisco products -- if you're looking to buy

11:33:47  10  counterfeit Cisco products, you direct the person that you're

11  buying them from to send you Cisco products?  Was there any

12  evidence to show that he said, "Hey, send me these transceivers,

13  make sure they're Cisco?"  No.

14          He said Cisco products; Cisco GBICs, genuine

11:34:07  15  only.  It says it right there in the e-mail.  This e-mail sums

16  up the case.  He was looking for under the contract with the

17  Marines genuine Cisco products and he asked for Cisco genuine

18  only.  And in the other e-mails he asks for Cisco.

19          I mentioned in my opening statement the facts of

11:34:27  20  the case were simple.  Mr. Ashoor went onto Ebay trying to

21  purchase genuine Cisco products.  He had those products shipped

22  to him in Houston.  The products were seized by Customs in

23  Chicago before he ever received them.  They're deemed to be

24  counterfeit.

11:34:45  25          And now, he's charged with a federal crime.  If

1  the evidence shows anything, maybe it shows that you can't buy

2  stuff off Ebay.  It's too risky.

3          Now, you saw the Government attorneys a lot more

4  than you saw me.  They asked a lot of questions.  I asked a few

11:35:05  5  questions.  They introduced a bunch of exhibits.  I introduced a

6  few exhibits, some of which are theirs.  They called numerous

7  witnesses.  I called zero witnesses.  Is this because the

8  defense was trying to hide something?  No.  Is this because

9  Mr. Ashoor is guilty?  Absolutely not.  Absolutely not.

11:35:28  10          What it does mean is that we want to stick to the

11  issues:  Did Mr. Ashoor use a counterfeit mark?  Did Mr. Ashoor

12  know that the mark was counterfeit?  Those are the two big

13  issues we're talking about here.  We didn't need to show you a

14  map of Iraq and talk about how the products were or why they

11:35:47  15  were being used or why the Marines needed to order them.

16          We know the Marines needed to order them.  They

17  ordered them.  That speaks for itself.  That's blurring the

18  issues.  What the Government has tried to do is pull on your

19  heartstrings.  They have tried to elicit an emotional response

11:36:05  20  from you by confusing the issues.

21          MR. VARNADO:  Just object to that, your Honor.

22          THE COURT:  Sustained.  That's improper.

23          MR. FERRARI:  They put two fine gentlemen on the

24  stand, United States Marines, war heros; and those gentlemen

11:36:21  25  told us that they use these products and what they use the

 1  products for.

 2            But they didn't say anything that related to

 3  Mr. Ashoor's knowledge that the goods were counterfeit.  They

 4  didn't say anything related to Mr. Ashoor's use of a counterfeit

 5  mark.  They told us why they needed them; and Gunnery Sergeant

 6  Britton, who is an impressive -- I was very impressed with him.

 7  It made me proud to be an American when I saw him on the stand

 8  in his uniform.  It really did.

 9            He told me that he thought Ebay was an unreliable

10  source.  I said, "Well, you wrote the contract, didn't you?"

11  "Yes, I did."  "Why didn't you put anything in the contract

12  about people not buying from Ebay?"  And I asked him, "Is it

13  fair to assume that the awarded party would think they could

14  purchase from Ebay given the language of the contract?"  And he

15  said, "Yeah."

16            Now, the Government says if you use the word

17  "Cisco," you're using the counterfeit -- the trademark.  That's

18  use of a counterfeit -- or that's use of the trademark.  If you

19  say the word "Cisco" in an e-mail, if you ask to purchase Cisco

20  products, that's use of a counterfeit?

21            Did Mr. Ashoor ever produce those products?  Did

22  he have them manufactured?  Did he request them to be

23  manufactured as Cisco products?  No, he didn't.  Did he ever

24  control the products?  Remember what I said in my opening:

25  never received, never possessed, never controlled.  That's a

1    question you guys have to decide.  I can't decide that for you.

2              The price issue.  The goods were cheap.  They

3    were really cheap.  There's no evidence introduced to suggest

4    that they were counterfeit.  Could have been a million and one

11:38:18    5    reasons.  Could have been overstocked goods.  I asked

6    Mr. Wickman, "Did you ask him if they were overstocked goods?"

7    He said, "No."  I said, "Did you ask if they were clearance sale

8    items?"  He said, "No."  "Did you ask if he thought the goods

9    were stolen?"

11:38:32    10             Remember, we're not talking about illegally

11   obtained.  We're talking about counterfeit.  He said, "No, I

12   didn't ask him that."  Could have been a million and one reasons

13   why -- a million and one reasons why those goods were being sold

14   at that price.  It doesn't necessarily mean they were

11:38:48    15   counterfeit.

16             Now, the Government says Mr. Ashoor knew it.  He

17   knew it the whole time.  And they talked about an authorized

18   distribution network that Mr. Ashoor knew about, and they talked

19   about the fact the goods are coming from China, and they talked

11:39:03    20   about the fact of the pricing again.  Let's address them one by

21   one.

22             Let's address the authorized distribution

23   network.  Cisco's own representative took the stand and told you

24   -- he told you, you can buy genuine Cisco products outside of

11:39:22    25   the distribution network.  If Mr. Ashoor knows about the

1   distribution network, doesn't he know that maybe you can also

2   buy genuine products outside of the distribution network?  Is

3   that maybe why he wasn't concerned with it?  There goes that

4   argument.  They got two more.

11:39:39   5            They stated, "Well, the goods were coming from

6   China, he should have known."  Yeah, if he listened to Jason

7   Sun, networking-sales@hotmail.com.  But the Government's expert

8   witnesses -- these are experts -- they sat there and they told

9   us, didn't they?  They told us that the parts that go into some

11:39:57  10   of these products are from China and that some of these products

11   themselves are manufactured in China.  So you can get Cisco

12   parts from China -- or Cisco parts from China, can you not?

13            They got one argument left.  And that argument's

14   the prices.  And I had the two experts on the stand; and I asked

11:40:23  15   them, "Could you make a determination as to the authenticity of

16   these goods based on the price?"  They said, "No."  I said, "Did

17   you need to conduct a physical examination of the products to

18   know they were counterfeit?"  They said, "Yes."  They needed to

19   touch them, they needed to see them, they needed to possess them

11:40:45  20   to make a determination.  They could not make a determination on

21   the price.  Couldn't do it.

22            No arguments left.  I had three fingers up.

23   There's none left.

24            What I want to do with the rest of my time is

11:41:01  25   let's go through the witnesses, and let's talk about the

1  witnesses and what they said.  I won't draw the inferences.

2  I'll allow you guys to draw the inferences, okay?

3              First Government witness, Warren Widener, Cisco

4  brand manager, got up on the stand; and he talked again about

11:41:21  5  the authorized distribution network.  Cisco is up here.  We got

6  the authorized distributors here.  And you got the resellers

7  right down here.  And the resellers are obligated to buy from

8  the distributors.

9              Those are Cisco's rules if you want to stay in

11:41:39  10  Cisco's program; and if you violate those rules, you violate

11  Cisco's partnership agreement; but you don't violate a federal

12  criminal statute.  You don't violate the law.  You violate

13  Cisco's rules.

14              Then he talked about PC Vision, and Mr. Ashoor

11:41:55  15  used to work at a company and he's done this sort of thing

16  before.  He's bought from unauthorized sources, and he knows you

17  shouldn't do it.  And I asked Mr. Widener, I said, "Mr. Widener,

18  those products that he bought when he was at PC Vision, were

19  those counterfeit?"  "No, they weren't counterfeit."  "So those

11:42:14  20  were genuine products?"  "Yes, they were genuine products."  "So

21  Mr. Ashoor wasn't involved in the purchase of counterfeit

22  products, was he?"  He said, "No."  He said, "They were from

23  unauthorized sources so we had to kick them out of the program."

24              He was never charged with anything.  Then I asked

11:42:32  25  one more question right at the end.  I looked at Mr. Widener and

1    I said, "Mr. Widener, is it possible to purchase genuine Cisco

2    products from unauthorized sources?"  And he said, "Yes, it is."

3    That was witness number one.

4              Witness number two was Staff Sergeant Chieffalo,

11:42:56  5    and they brought in Staff Sergeant Chieffalo from Okinawa.  They

6    brought him in here to testify, and he was an impressive young

7    man, too.  And he stood up there and told us about Iraq, where

8    the base was, what they used the products for, that sand gets

9    into the products and disrupts the product's operation.  And he

11:43:17  10   said that he requested these products.

11             I asked him did he write the language in the

12   contract.  He said, "No, I just requested the products."  Good

13   information to know but does it deal with the issues?  Does that

14   have anything to do with Mr. Ashoor using a counterfeit mark?

11:43:33  15   No.  Does that have anything to do with Mr. Ashoor knowing the

16   counterfeit mark was used?  No, it doesn't.  No, it doesn't.

17             And then we had my favorite witness, Gunnery

18   Sergeant Britton.  And I said before I was impressed with the

19   young man, very impressed with him.  And he was the contracting

11:43:59  20   officer.  He wrote the contract.  He wrote the attachment that

21   the Government just pointed out to you, "genuine Cisco products,

22   no imitation brands."

23             And that's all -- those are the only limitations

24   he put on the contract.  I asked him, "Did you put any, any,

11:44:16  25   information in the contract that would limit the awarded party's

1  ability to procure the goods?"  "Just be genuine Cisco GBICs."

2  That's what they wanted.  No imitations.

3              Stop and hold that thought for a second and look

4  back at these e-mails.  What is Mr. Ashoor asking for?  Was he

11:44:32  5  asking for transceivers?  Was he asking for GBICs?  Yeah.  But

6  what else was he asking for?  Cisco.

7              And the Government says, Well, you know, he's --

8  he said put Cisco in there because he wanted -- he had to direct

9  them to this contract.  The contract awarded to Mr. Ashoor said

11:44:52  10  "Get us genuine Cisco products" and he went out and the e-mails

11  show that he went to try to get Cisco products.  What's wrong

12  with that?

13              What if it would have been the other way around

14  and he didn't ask for Cisco products?  He asked for Cisco

11:45:06  15  products.  What else was he supposed to ask for?  I don't

16  understand that.

17              Let's go back to Britton, Gunnery Sergeant

18  Britton.  The Government says that he put that language in the

19  e-mail so that the awarded party would be on the lookout.  I

11:45:24  20  didn't see any language in there that said to be on the lookout

21  for counterfeit goods.

22              What they said is that we need Cisco products

23  because we've had these problems with imitation brands, not,

24  "Hey, there's a lot of Chinese vendors selling these products

11:45:39  25  for really cheap.  Make sure you verify the sources."  Nothing

1   like that.

2               And he told us -- Gunnery Sergeant Britton told

3   us, "Well, Ebay is not a reliable source."  And I asked him,

4   "Why didn't you put that in the contract and say don't buy them

11:45:55   5   from Ebay?"  "I don't know, sir."

6               And then we talked about and the Government

7   talked about -- and this was, I think, probably a lot of

8   people's favorite moment over the past couple of days.  And they

9   said, "Sergeant Britton, it was represented to you again the

11:46:13   10   parts were $600 per unit, correct?"  He said, "Yeah."

11               And he said, "Well, if you knew that Mr. Ashoor

12   was going to get them for $25 per unit, would you have thought

13   there was a problem with -- or would you have thought they were

14   legitimate?"  And he said, as Mr. Costa said, "Hell, no.  Sir."

11:46:36   15               But what the Government doesn't want to talk

16   about is the fact that Mr. Ashoor didn't know he was getting the

17   products for $25 per unit at the time that he signed that

18   contract.

19               Let's go back to my opening statement one more

11:46:46   20   time.  I said that Mr. Ashoor's business is to bid on federal

21   contracts to procure and deliver goods to federal agencies in

22   the military; and he carries out this business by researching

23   the goods, figuring out what it's going to cost him to procure

24   them, including his markup; and then he bids.  And if and when

11:47:10   25   he wins the contract, he will go out and try to procure the

1   goods; and that's what happened.

2              He did his research, said, "All right, these

3   things cost around 600 bucks approximately."  So that's what he

4   quoted the Marines.  And then he went out to look for them, and

11:47:27   5   then he sees a company online, on Ebay, with 100 percent

6   customer rating; and they said, "We're selling transceivers";

7   and he writes them an e-mail, "Hey, I need Cisco transceivers.

8   Can you deliver these?"  And they said, "Yeah, just send us the

9   money."

11:47:44  10              That was -- those were the products that were $25

11   per unit.  He found those a month after -- a month after he made

12   that representation to the Marines.  He didn't know at the time

13   he made the representation to the Marines he was going to find

14   them for $25 per unit.

11:48:05  15              And then Sergeant Britton said something really

16   interesting -- well, Staff Sergeant Chieffalo and Gunnery

17   Sergeant Britton said something interesting.  They said they

18   used Cisco products because that's what -- the equipment the

19   Marines used, that's the kind of products they worked with and

11:48:19  20   they need Cisco Systems products.

21              And then Gunnery Sergeant Britton took the stand

22   and he said, "We don't buy from Chinese -- from the Chinese.

23   The Marines don't buy from the Chinese."  That's what he said.

24   And then the Government put on two expert witnesses which said,

11:48:37  25   "Yeah, we produce genuine Cisco products on behalf of Cisco and

1   we assemble" -- in Finisar's case "We assemble them in Malaysia

2   using, in some instances, Chinese parts.

3                   And then Ms. Barraza from Avago Corporation gets

4   up there and she says, "We manufacture them globally.  We

11:48:59  5   manufacture some parts for Cisco in China."  I wonder how the

6   Marines feel about that.  I wonder how they feel knowing that

7   Cisco Systems is outsourcing the manufacture of their products

8   to companies that are producing them in China and the Marines

9   think that they're not getting products from China.

11:49:22  10                   And then we had Special Agent Daniel Nugent.

11   He's the one who actually seized the goods in Chicago, and he

12   said there was a bunch of stuff that made him suspect that the

13   goods were counterfeit.  And he said he saw that box.  I suppose

14   this box does look pretty suspect.

11:49:42  15                   And he said, "I saw that box and I suspected

16   counterfeit goods were in it."  I said, "Agent Nugent, that box

17   was seized in Chicago, right?"  He said, "Yes."  I said, "It

18   wasn't seized in Houston?"  He said, "No, it wasn't."  I said,

19   "Did Mr. Ashoor ever get a chance to see that box?"  "No, he

11:49:59  20   didn't."  "So how would Mr. Ashoor suspect, based on this box,

21   that the goods were counterfeit?"  "I guess he wouldn't."

22                   Then he said, "Well, you know, the shipping

23   label.  The shipping label made me suspect it."  "Was the

24   shipping label with the box?"  "Yes, it was."  "Did Mr. Ashoor

11:50:16  25   see the shipping label?"  "No, he did not."  "So I guess it's

1  safe to assume that he couldn't suspect from the shipping label

2  that the goods were counterfeit?"

3           And then he said, "Well, I looked at the

4  location, Shenzhen, China."  And he said, "And that's a known

11:50:36  5  location for manufacturers of counterfeit products."  I said,

6  "Do you know it?"  He said, "Yes, I do."  I said, "Before you

7  became a Customs agent, did you know where Shenzhen, China,

8  was?"  He said, "No, I didn't."  Is Mr. Ashoor a Customs agent?

9  Is he a law enforcement official?  No.

11:50:55  10          Just because it was coming from Shenzhen, China,

11  why would he suspect anything?  He asked for Cisco products and

12  he thought he was getting Cisco products.  And then Agent Nugent

13  said, "Well, the documentation, if you look at the invoice."

14  Again, where was the documentation?  Where was the invoice?  It

11:51:15  15  was with that box in Chicago.  And where was Mr. Ashoor?  He was

16  in Houston.

17          Did he see it?  No, he did not.  How can he

18  suspect from the documentation and the invoice that the goods

19  were counterfeit?  He never received it.  He never possessed it.

11:51:33  20  He never even saw it.  Remember my opening statement, that's

21  what I said to you.

22          Then we had Mr. Zhao, the first of the two

23  Government witnesses.  And Mr. Zhao has two master's degrees, a

24  very smart guy.  And he actually works for Finisar, and Finisar

11:51:53  25  manufactures some of these GBICs.

1    And the Government asked him, "Where do you

2  manufacture these?"  He said, "We got an assembly plant in

3  Malaysia."  And I got up there and I asked him, I said, "You got

4  an assembly plant.  Does that mean you bring in parts from other

11:52:11  5  places and you put the goods together there?"  He said, "Yeah."

6  I said, "Where do these parts come from?"  "Globally."  "Where,

7  can you give me some examples?"  "Just all over the place."  "Do

8  they come from China?"  "Definitely.  Definitely," he said.

9    And then I asked him, "Mr. Zhao, you listed a

11:52:29  10  variety of attributes that made you know that these goods were

11  counterfeit."  He said, "Yeah."  And I said, "To do so, did you

12  need to conduct a physical examination of the products?"  And he

13  said -- he was a little bit confused; but after we re-explained

14  it, he said, "Yes."

11:52:46  15    I said, "So you needed to touch and you needed to

16  see the products in order to determine they were counterfeit?"

17  And he said, "Yeah."  I said, "Could you have made the

18  determination based on the price that these goods were not

19  authentic?"  And he said, "No."  He needed a physical

11:53:08  20  examination.

21    And then Ms. Barraza came up, and Ms. Barraza

22  works for Avago Corporation, and they manufacture some of the

23  GBICs on behalf of Cisco.  And Ms. Barraza said that, in fact,

24  they manufacture some of Cisco's products in China.  Cisco

11:53:26  25  Systems products manufactured in China, genuine.

1          MR. COSTA:  I would just object, your Honor, because

2  she said these products were not manufactured in China.

3          THE COURT:  Ladies and gentlemen, you recall what the

4  testimony is.  I'm not going to enter into this.  You heard the

11:53:37  5  statement by defense counsel; you heard the response by the

6  prosecutor.  You recall what the testimony was.

7              Go right ahead.

8          MR. FERRARI:  Some of the Cisco products were

9  manufactured in China.

11:53:52  10          And I asked her, "Did you need a physical

11  examination to determine the non-genuine nature of these

12  products?"  And she said, "Yes."  I said, "So you needed to

13  touch them, you needed to see them to determine they were not

14  counterfeit?"  And she said, "Yeah."

11:54:07  15          And then I asked her the same question I asked

16  Mr. Zhao:  "Could you make a determination as to the

17  authenticity of these goods based on the price?"  And she said,

18  "No."  She said, "No."  These are the Government's experts.  We

19  didn't introduce them.  The Government introduced them.  But the

11:54:30  20  Government wants to go back to that e-mail right there and say

21  networking-sales@hotmail.com told Mr. Ashoor he couldn't get

22  genuine products from China.

23          And then we had Special Agent Corbin Wickman.

24  And one of the first questions I asked Agent Wickman was --

11:54:52  25  well, I guess it wasn't one of the first.  It was one of the

1   latter questions, I recall, excuse me.  But one of the questions
2   I did ask him was who's Jason Sun?  And what did he say?  He
3   goes, "I don't know."  "You don't know?"  Agent Wickman is the
4   investigating case agent on this case.  He doesn't even know who
11:55:13   5   this guy is.

6               Who is this guy?  We have two experts saying you
7   can buy goods from China -- or that some Cisco products are made
8   in China or used parts that come from China, but we're supposed
9   to believe networking-sales@hotmail.com over the experts?  Who
11:55:36   10   is this person?  Nobody knows.  I don't know and Agent Wickman
11   didn't know.

12               And then I asked Agent Wickman, "You were
13   suspicious of the packaging?"  And he said, "Yeah."  I said, "He
14   asked for individual sealed Cisco packaging, correct?"  He goes,
11:55:59   15   "Yes."

16               Ladies and gentlemen, is it odd to ask for Cisco
17   products to come in Cisco packaging?  Is that odd to you?
18   Mr. Costa used the example of Nikes.  Would it be suspicious to
19   you if you went to a store and you heard somebody say, "Hey,
11:56:19   20   make sure those Nikes are in a Nike box?"  Maybe.  Or maybe
21   there would be some other form of packaging that the goods would
22   come in.

23               So I asked Mr. -- or Agent Wickman, I said, "Are
24   you familiar with any other forms of packaging other than the
11:56:36   25   individual sealed bags?"  And he said, "Yeah.  There's bulk

1  packaging.  Sometimes they come bulk."

2              Remember what Staff Sergeant Chieffalo said.  He

3  pulled out these little silver bags, didn't he?  And they were

4  static wrappers or antistatic or -- they were these silver bags.

11:56:55  5  And they were individual bags, were they not?  That's what they

6  were expecting, and Mr. Ashoor knows how the packaging comes as

7  far as these particular products.

8              And he said, "Hey, these come in individual

9  packaging.  Maybe these guys have them in the bulk packaging.

11:57:14  10  Let's make sure they're in the right bags for these guys."  Does

11  that mean they were counterfeit or that he thought they were

12  counterfeit?  No.

13              He was trying to make sure that these guys got

14  the packaging they were used to because sometimes they come in

11:57:28  15  bulk, not because, "Hey, we got to have a coverup here.  We got

16  to make sure the Marines don't know."  Sometimes they come in

17  bulk packaging.  So he asked for the individual bags, Cisco bags

18  with Cisco products.

19              And then Agent Wickman was suspicious of the

11:57:41  20  address which the goods were being shipped to, 3505 Sage Road,

21  Suite 603, Houston, Texas, the Mark Condominium.  So Agent

22  Wickman investigated who owned that property.  And who owned the

23  property?  Mr. Ashoor owned the property.

24              And I asked him, "You were suspicious of

11:58:03  25  Mr. Ashoor having goods delivered to a property in which he

owns?"  And he said, "Well, it was 18 miles away from his

house."  But if you remember what the shipping label said, it

says Ehab Ashoor, director of sales, CDS Federal, doing

business, or DBA, as Corporate Data Systems.

11:58:26   And when the Government presented the articles of

incorporation, if you looked at the registered address -- and

it's Exhibit 17 in the Government's exhibits -- it says

registered address, CDS Federal, 3505 Sage Road, Suite 603,

Houston, Texas.

11:58:44   Mr. Ashoor was having goods that he purchased as

part of a business transaction shipped to his business's

address.  Is that suspicious?  Maybe some of you aren't -- maybe

some of you do think it's suspicious.

Let me ask you this -- or remind you of this and

11:59:06   then ask you a question.  Agent Wickman said at the Mark

Condominium, there was two mail storage units where residents

could have their packages stored and they could come and pick

them up and that, in fact, Mr. Ashoor would go every couple of

weeks and pick packages up.

11:59:27   Now, Mr. Ashoor had 200 computer parts coming to

him.  So I asked Agent Wickman, I say, "Agent Wickman, did you

see any sort of mail storage unit or anything like that in front

of Mr. Ashoor's personal residence?"  He said, "No."  You got

200 computer parts coming to you, are you going to have them

11:59:40   sent to the place where somebody can grab them and put them in a

1  unit for safekeeping or are you going to have them sitting on

2  your doorstep because they delivered them when you're not home?

3              And then Agent Wickman talked about undercover

4  operations and that he conducted some undercover operations, and

12:00:05  5  Mr. Varnado got up there and he said, originally, he was going

6  to sell these Cisco GBICs, these same ones, for $695.  But when

7  Agent Wickman disguised as an undercover agent -- or acting as

8  an undercover agent, rather, said he can't afford that price,

9  Mr. Ashoor went down on the price, almost $400, to around -- I

12:00:24  10  don't recall the same number; but if you recall, it was

11  somewhere around $400 less.

12              And he said -- and what did Mr. Ashoor say to

13  Agent Wickman?  He said, "I'm going to take a loss on this."

14  And what did -- and Agent Wickman -- I forgot to mention earlier

12:00:42  15  but let me bring it up now:  Agent Wickman had made this order

16  for these Cisco parts, these GBICs, as part of a larger order.

17  He only ordered 12 of the GBICs and he put together this list of

18  stuff he was ordering.

19              And so Mr. Ashoor said, "I'll take a loss on

12:00:59  20  this" but he wanted to win the whole contract.  He wanted to

21  supply all the goods.  So it wasn't that he's taking a loss on

22  it because he knows he's going to get these for $25.  He's still

23  going to make a ton of money.  He took a loss on it because he

24  wanted the contract.  He wanted the whole thing.  And he was

12:01:18  25  going to make money on the whole thing.

1            But probably what's most telling to me is about

2      the last two or three minutes of my conversation -- of my cross

3      examination of Agent Wickman.  And Agent Wickman went to

4      Mr. Ashoor's residence and I asked him, "Did he let you in?"

12:01:34  5      "Yeah."

6                  THE COURT:  30 minutes has gone.

7                  MR. FERRARI:  Thank you, your Honor.

8            I asked him, "Did he seem evasive?"  "No."  "Did

9      he seem nervous?"  "No, he didn't."  I said, "Did he ever ask to

12:01:48 10      have a lawyer present?"  "No."  I said, "Did he ever request to

11      stop answering your questions?"  "No."  I said, "Did he provide

12      you with documentation of the transaction?"  He said, "Yeah, he

13      did."

14            And what I didn't ask him but what he did tell us

12:02:07 15      is that Mr. Ashoor let him into his house, not only let him into

16      his house -- you got a federal agent knocking on your door and

17      you let them into your house; and they're saying, "You purchased

18      some stuff, you're having it shipped to you and we think it's

19      counterfeit."

12:02:18 20            Mr. Ashoor said, "I got nothing to hide.  Come on

21      in.  Come into my home office.  This is where I do my work.  Sit

22      down in front of my computer.  Let me show you the e-mails right

23      off of my computer."  Now, I don't know about all of you but I

24      don't let anybody see my e-mails.  I don't sit down with my

12:02:39 25      e-mail account open and --

1              MR. VARNADO:  Objection.  Relevance, outside the

2    evidence.

3              THE COURT:  And what else?

4              MR. VARNADO:  He's arguing outside the evidence, your

12:02:48  5    Honor.

6              THE COURT:  Sustained.

7              MR. FERRARI:  He sat down with Agent Wickman and he

8    showed him his e-mails on his computer in his home office in his

9    house when Agent Wickman who's a federal agent suspects that

12:03:00  10   Mr. Ashoor might be involved in the trafficking of counterfeit

11   goods.

12              And I asked Agent Wickman, I said, "Agent

13   Wickman, after you left Mr. Ashoor's house that day, did you

14   arrest him?"  "No, I did not arrest him."  I said, "Were you

12:03:18  15   certain that he had trafficked in counterfeit goods?"  He said,

16   "No, I wasn't certain."  I said, "Agent Wickman, does that mean

17   after listening to Mr. Ashoor's side of the story, seeing his

18   documentation that you thought maybe he hadn't -- he hadn't

19   trafficked in counterfeit goods?"  And he said, "Yeah.  Maybe he

12:03:39  20   didn't know.  Maybe he didn't know the goods were counterfeit."

21              Ladies and gentlemen, let me reiterate the facts

22   -- and I know I've done it a bunch of times and I'm starting to

23   sound like a broken record.  But they're important and they're

24   simple and they should be easy for you to remember.

12:03:56  25              Mr. Ashoor tried to purchase genuine Cisco

1  products on Ebay.  He had the products shipped to him in

2  Houston, not to the Marines in Iraq.  The goods were seized in

3  Chicago by Customs agents.  They were deemed to be counterfeit,

4  and he was charged with a crime.

12:04:17   5          And the Government stated the two big issues are

6  -- well, they think there's one big issue for us but there's

7  really two big issues in our eyes:  Did he use a counterfeit

8  mark?  There was no definition of that that we were given.  But

9  did he use a counterfeit mark?  I don't see how he could have

12:04:35   10  used it.

11          He didn't manufacture the goods.  He didn't see

12  any evidence that suggests that he directed them to put Cisco on

13  the goods.  He didn't control the goods.  He didn't possess the

14  goods.  He never even saw the goods.  But the Government

12:04:51   15  contends he used a counterfeit mark.

16          And then the big, big issue, the big one:  Did he

17  know, that he should have known?  Now, they want to draw

18  inferences that he's looking to sellers online to buy Cisco

19  products and he's telling them, "Hey, I need Cisco's products"

12:05:08   20  and that somehow is suspicious of wrongdoing.

21          I don't know what -- I don't know if he's

22  supposed to ask for Dell products but he asked for Cisco

23  products.  That's what he asked for.  But they want to say he

24  should have known better because he could have bought it outside

12:05:25   25  of the authorized distribution network.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1           He said -- they said that he should have known

2    better because they came from China, they were coming from

3    China.  They said he should have known better because the prices

4    were so low.  That's what we talked about at the beginning.  I

12:05:41  5    already talked about this, didn't I?

6           Cisco's own rep got up on the stand and told us

7    you can buy genuine products outside of the authorized

8    distribution network.  He already told us that.  The

9    Government's own expert witnesses told us that some of these --

12:05:55  10   some Cisco parts, some Cisco parts, are manufactured in China

11   and some Cisco parts are assembled from parts -- or products --

12   Cisco products are assembled from parts that come from China.

13   And both expert witnesses told us the same thing:  You can't

14   determine the authenticity of these goods based on the price.

12:06:24  15          Ladies and gentlemen, the evidence showed what

16   this case is all about; and what this case is all about --

17          THE COURT:  You have five minutes left.

18          MR. FERRARI:  Thank you, your Honor.

19          What this case is all about is Mr. Ashoor got

12:06:34  20   ripped off.  He got ripped off by an online seller on Ebay.  And

21   they're sitting in China or Hong Kong with $5500 of his money

22   and he's sitting here in a federal courthouse not knowing what's

23   going to happen next.

24          And what did Agent Wickman tell them when he left

12:06:56  25   Mr. Ashoor's house that day?  "You should try to get your money

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    back."  Mr. Ashoor was ripped off and the counterfeiters are

2    laughing all the way to the bank.  He made a bad business

3    decision.

4                  He thought he could get genuine Cisco products

12:07:14  5    for $25 through an online seller.  Poor business decision.

6    Should he be banned from Cisco's partnership program?  Probably.

7    Should the Marines not do business with him anymore?  Maybe

8    that's a good idea.  But should he be convicted of a federal

9    crime and suffer whatever consequences might come with that?

12:07:36  10   Absolutely not.

11                 Ladies and gentlemen, you told the judge that you

12   would be fair and impartial, and I trust you to be fair and

13   impartial.  When you look at these issues and you look at the

14   evidence, you must return a verdict of not guilty.  You must

12:07:52  15   return a verdict of not guilty.

16                 I thank you for your time.  I thank you for your

17   attention.  And I thank you for your service.

18                 THE COURT:  All right.

19                 Government, you got about nine and half minutes

12:08:04  20   left.

21                 MR. VARNADO:  Thank you, your Honor.

22                 Good morning, ladies and gentlemen.  You heard

23   the judge say I only have less than ten minutes and I'm going to

24   try not to even use all of that.

12:08:25  25                 It's very telling that Mr. Ferrari, during his

1  entire closing argument, never put up a single e-mail from

2  Ingellen.  Instead, he left this e-mail up there, the instance

3  when soon after the contract he sends an e-mail asking about

4  genuine only.  He never asks about genuine only in any of those

12:08:47  5  e-mails with Ingellen.

6         That's Government's Exhibit 14.  Please go back

7  there and look at all those e-mails and look at how that

8  conversation is going back and forth.  He never asks if those

9  parts are genuine.  And in fact, Ingellen -- Mr. Ferrari just

12:09:02  10  told you Mr. Ashoor -- Ehab Ashoor was ripped off.  He was a

11  victim.

12         This is what that Ebay advertisement said:  Ten

13  pieces new bulk WS-G5486.  Look at that in Exhibit 14.  Look at

14  the invoice.  Nowhere is the word "Cisco" on the documentation

12:09:23  15  that Ingellen is providing in the invoice and in its ad.

16  Nowhere does Ingellen ever say the word "genuine products."

17         It says, "Tell me what you need."  And then

18  Mr. Ashoor proceeds to tell him -- or tell Vivian that, "Well,

19  we want to make sure these GBICs are Cisco.  They definitely

12:09:42  20  need to be in Cisco packaging.  And in fact, we're even willing

21  to pay the extra money to get them wrapped in individual plastic

22  bags to make it look even more legitimate."

23         So I just wanted to point that out here at the

24  beginning because, really, Mr. Ferrari never addressed the issue

12:09:57  25  that Mr. Costa brought up that Ingellen never represented these

1   products to be original, never did.  And he didn't address that.

2             And another item that Mr. Ferrari did not address

3   -- he gave you a little head fake with the 305 Sage Road -- why

4   does Mr. Ashoor ever have these goods sent to Houston at all?

12:10:18   5   Why is he ever wanting to import them to Houston if they're

6   going to Iraq?

7             He's buying them in China.  He knows they're from

8   China.  The reason he imports them into the United States with

9   the intention of them arriving in Houston is because he does not

12:10:34   10   want this box of garbage to show up at the door step of the

11   United States Marine Corps in Fallujah where they take one look

12   at it and the label and everything else and say, "This is

13   counterfeit.  This is nonsense."

14             He wants it to come in -- and there is -- there

12:10:50   15   is something to the address.  Mr. Ferrari is telling you that's

16   his business address.  Well, here's the contract with the

17   Marines.  That's his home address on Castlemaine Court in Sugar

18   Land.  He didn't have it sent there.  But even look at the

19   bigger picture.  Look at the bigger picture of why is it ever

12:11:08   20   coming into the United States at all, at all, if it was

21   legitimate?

22             You're buying legitimate products.  Have it sent

23   right on to the Marines.  He bought this on July 21st of 2008,

24   and those goods were due on July 28th.  He still had them

12:11:22   25   imported into the United States.  He was going to get rid of

1 this.  He was going to make it look nice and neat.  He was going

2 to get it packaged off to make it look more legitimate.

3          Mr. Ferrari said several times that Mr. Ashoor

4 never possessed these goods or never controlled these goods,

12:11:39  5 never saw these goods; and the problem with continuing to say

6 that is that's not an element of the crime.  The Government

7 doesn't have to prove that he possessed these things.  Just like

8 a drug trafficker.  If somebody is importing drugs and they're

9 intercepted at the border, would you say, "Well, they're not a

12:12:00  10 drug trafficker, they never actually arrived in the drug

11 dealer's hands"?  Nonsense.

12          I'll just briefly address the definition of

13 "traffic," which is in Definition Number 13.  That could be

14 transporting, transferring, or it can simply be importing; and

12:12:16  15 we all know that he was importing these with the intent to send

16 them on to the Marine Corps.  Look at your instructions.

17 Nowhere does it say that Mr. Ashoor had to possess these goods

18 or that somehow that's an element to the offense.  It's not.

19          Mr. Ferrari also talked about possession in terms

12:12:35  20 of, well, the engineers had to see these products to determine

21 they were counterfeit.

22          THE COURT:  Five minutes left.

23          MR. VARNADO:  And that makes perfect sense because the

24 engineers don't have the e-mails with Ingellen telling him what

12:12:49  25 packaging he wants.  And Mr. Ferrari said, "Is it odd to say you

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  want Cisco packaging with your Cisco product?"  Well, yes, it's

2  odd.  It goes without saying, if you're buying Nike shoes,

3  they're in a Nike box.  And they come in a Nike bag.  You don't

4  go around and tell them, "Oh, I want this" -- you know, as

12:13:04  5  Mr. Costa said, some sneakers, "Oh, and make them Nike."

6          That's when you know you're dealing with

7  counterfeit goods, and that's when you know that the Defendant

8  knew he was dealing with counterfeit goods.  The engineers

9  didn't have that.  They didn't have this warning e-mail that

12:13:16  10  goods from China are counterfeit.  They didn't have the other

11  e-mail that, "Listen, selling Cisco to the government, that's

12  risky.  I don't want to be a part of that."

13          They didn't have -- you know, Mr. Ferrari asked

14  some questions about price.  The engineers had no idea what

12:13:29  15  Mr. Ashoor paid for these, $25 on Ebay.  They simply came in

16  here to provide you with information in no uncertain terms that

17  those products were, in fact, counterfeit and to point out some

18  of the risks associated with why these products are deficient

19  and how that can be a problem.

12:13:49  20          So don't get caught up with this, "Oh, Mr. Ashoor

21  had to either possess these goods or" -- you know, the

22  engineers, of course, the engineers had to see them.  They

23  didn't know all the stuff Mr. Ashoor knew about the way this

24  transaction went down, the exact price he paid, how he got them,

12:14:01  25  and how many warnings he had received beforehand.

1                 I want to show another instruction up here.  I

2        think it's important.  And this is what I want you to take away

3        as you go back there; and again, look at the big picture.  And

4        Mr. Ferrari came up here and ticked off one, two, three -- did

12:14:23   5        exactly what we told you he was going to do, attack each piece

6        of evidence.

7                 You're charged with looking at the big picture;

8        and all the evidence, all the stuff in this box -- and you saw

9        in our -- in Mr. Costa's Power Point presentation all that

12:14:35   10       evidence laid out there.  You saw one e-mail that didn't even

11       involve Ingellen sit up on this board the whole time during

12       Mr. Ferrari's closing argument.

13                But the most important thing, as you go back

14       there and look at this evidence, is to use something you had in

12:14:51   15       your possession before you ever walked in the courtroom and in

16       the courthouse on Monday, and that is, to use your common sense.

17                And in the instruction on direct and

18       circumstantial evidence, you are -- you are told, in other

19       words, you may make deductions and reach conclusions which

12:15:09   20       reason and common sense lead you to draw from the facts which

21       have been established by the evidence.

22                That is what the Government is asking you to do

23       in looking at this -- in looking at the evidence, looking at the

24       big picture, is use your common sense.  And what does your

12:15:26   25       common sense tell you?

                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          Before Mr. Ashoor purchased these goods, he knew

2     how to get authorized -- he knew how to get legitimate product.

3     He was well versed in that, experienced in the computer

4     industry.  He certainly knew what the price was.  He made a bid

12:15:41   5     that was spot on with what the market research would bear, what

6     the Cisco witness told you these goods would cost.

7          So he knows the price.  He knows how to get these

8     goods.  And he knows where to get them.  Your common sense tells

9     you all that.  Mr. Ferrari said, "Well, there's a million

12:15:57  10     reasons that the price could be $25.  Maybe it's a clearance.

11     Maybe it's this."

12          Look at those e-mails with Ingellen.  Mr. Ashoor

13     never asks why the price is so low.  Not once.  If there's a

14     million reasons, well, where are the questions?  Mr. Ashoor

12:16:14  15     never asks Ingellen, "Confirm that these are going to be

16     genuine.  These are going to the Marine Corps for a contract I

17     have."  Never.  Use your common sense with that, ladies and

18     gentlemen.

19          I also wrote down a couple of other notes here on

12:16:30  20     -- during -- what does your common sense tell you about during

21     the transaction?  I mentioned some of this:  the e-mails with

22     Ingellen.  There's no discussion with genuine product.  Look at

23     those e-mails in Exhibit 14.  Look at some of the other e-mails

24     in Exhibit 15.

12:16:42  25          You know, Mr. Ashoor specified the packaging he

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  wanted.  Ask yourself, why do you need to specify packaging if

2  you know you're buying legitimate goods?  Why do you want them

3  individually wrapped and why are you willing to pay a premium

4  for that if you know you're dealing in legitimate goods?

12:16:59  5  And again, that's where the using of the mark is.

6  He's directing -- we're not saying putting "Cisco" in an e-mail

7  is using a trademark.  When you direct this Ebay vendor in China

8  to put it in a Cisco bag, you know exactly how the Cisco program

9  works, you know the Cisco product even has Cisco in all caps,

12:17:17  10  he's directing the use of that mark and using that counterfeit

11  trademark.

12  And lastly, after the actual purchase of these

13  goods, he has the money from his account wired to China.  Again,

14  doesn't import the goods to Houston; instead -- I mean, does

12:17:33  15  import the goods to Houston instead of just sending them to

16  Iraq.  That's an enormous piece that the defense has never

17  addressed in any capacity.  Why are they coming into the United

18  States at all?

19  THE COURT:  Wrap it up, please.

12:17:46  20  MR. VARNADO:  Lastly, another small piece, he never

21  made a claim for these items.  Agent Wickman told you that these

22  items were seized, no claim was ever made.  Mr. Ashoor is out

23  $5,000, he's not going to go try to make a claim on these goods?

24  He was trying to get the $25 price of the GBICs down from

12:18:03  25  Ingellen.  He didn't want to pay $380 in shipping.

1          Ladies and gentlemen, use your common sense.
2    You've heard the evidence.  The judge has instructed you on the
3    law.  Go back there and find the Defendant guilty of trafficking
4    in counterfeit goods.
12:18:18  5          Thank you.
6          THE COURT:  Ladies and gentlemen, that now completes
7    the trial.  In a moment, I'll hand the jury instructions to my
8    case manager and you'll commence your deliberations.  We'll do
9    our little drawing in a moment.  Let me just run this passed
12:18:37  10   you.  I'll explain the time frames once I get back in later if
11   anybody has a question.
12          You may deliberate up to 6:00 p.m. every evening.
13   That's strictly up to you.  If you want to adjourn at 5:30 or
14   earlier, that's strictly up to you; but you may go up to 6:00
12:18:55  15   p.m.  However, we'll not be available to receive a verdict after
16   4:30.
17          So you may go all the way to 6:00 o'clock; but in
18   the event you have a -- what is it, a verdict, if it's after
19   4:30, we'll get together the next morning.  It will be sealed
12:19:11  20   up, and we'll do it that way.
21          As far as coming in in the morning, you're free
22   to get here as early as 9:00 a.m. because I'll be doing other
23   things, perhaps, in here; but it doesn't impact you.  Now --
24   however, not later than 10:00 a.m.  So those are the parameters.
12:19:31  25          Ellen tells me that you've ordered lunch; and as

1   soon as you get in there and start deliberating, we'll go across

2   the street.

3                    Right, it's across the street that we need to go?

4             THE CASE MANAGER:  Yes, sir.

12:19:41  5             THE COURT:  Now, we have the highlight of the -- well,

6   shall we say, this portion.  We're going to have our drawing.

7   Let me get my list out here.  We always ask that one of the

8   jurors do it and that the juror remain seated and just reach

9   over the top and grab it.

12:19:59  10                   We're going to do Juror Number 1, ////////.

11  Just remain seated.  We're going to bring over the box and just

12  draw two names, please.

13            A JUROR:  Did I give you one?

14            THE CASE MANAGER:  You gave me one.

12:20:26  15                   Thank you.

16            THE COURT:  Oh, somebody really wants out, I guess.

17  They're jumping right out of the box.

18                   By the way, when I announce your name, raise your

19  hand.  We have a little something for you.  We'll seal it up.

12:20:38  20  We certainly thank you.  And I suggest that whoever the

21  alternates are, exchange phone numbers with one or two of your

22  colleagues; and you can visit later on on the phone.

23                   If you would, please raise your hand.

24                   ////////.

12:20:49  25                   And ///////////.

1          THE COURT:  Ah.

2          A JUROR:  She's jumping out.

3          THE COURT:  All right.  Ladies and gentlemen, thank

4   you.  Hopefully, you'll agree this is the fairer way to do it.

12:21:02   5   You know, in most courtrooms, everybody knows who the alternates

6   are.  With the attorney's assistance, everybody is fully

7   eligible until the last-minute draw.

8          So when we go in the back -- actually, everybody

9   gets --

12:21:14   10          We got lunch coming up for everybody, right?

11          THE CASE MANAGER:  Yes, sir.

12          THE COURT:  If you want to sit -- we're going to ask,

13   though, that -- that you get going right away on your

14   deliberations.  So whoever -- what is it, the alternates, you

12:21:28   15   can exchange numbers and then depart; and as soon as available,

16   we'll get those remaining 12 lunches up to you.

17          So, ladies and gentlemen, on behalf of the

18   attorneys and myself, thank you.  You'll also have all the

19   exhibits brought into you in the jury room within a few moments.

12:21:43   20          I want the attorneys again to get together and

21   make sure the -- what is it, the books are accurate -- I mean,

22   the evidence books; and then they'll go back in with you.

23   Somebody will bring it back in.

24          Ladies and gentlemen, please stand, adjourn to

12:21:59   25   the jury room, commence your deliberations.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    (The jury retired to commence deliberations at 12:22 p.m.)

2        THE COURT:  All right.  Let's talk about the

3    attorneys.  I need you on ten-minute call.  It's now 12:23.

4    Beginning at 1:30, you need to be on ten minutes call.  You

12:22:49  5    don't have to hang around right here, but make sure Ellen has a

6    cell phone for you or something that, if you go back to your

7    office or whatever, you're back here in not more than ten

8    minutes.  So you can be up here, if you want.  You can hang out

9    down in the cafeteria or the library or whatever you have in

12:23:06  10    mind.  But you need to be on ten minutes call.

11        So go over the jury instruction books -- I mean,

12    the jury, what is it, evidence book; and then make sure Ellen

13    has a way to contact you.  We need you back in ten minutes but,

14    in no event, will you get a call earlier than 1:30.  So 1:40

12:23:26  15    would be the earliest you'd have to be back here if we get a

16    juror note and we have to wait on you, okay?

17        All right.  Thanks.  And we'll see you in a

18    little bit.

19    (Court recessed at 12:23 p.m.)

04:19:58  20    (Court resumed at 4:21 p.m.)

21        THE COURT:  We have a jury note.  It says, "We would

22    like to review various portions of Agent Wickman's testimony

23    from Tuesday afternoon."

24        Government's position, please?

04:20:58  25        MR. VARNADO:  Your Honor, that the jury should rely on

1    its own memory of the evidence and the testimony.

2              THE COURT:  And the defense position?

3              MR. FERRARI:  Your Honor, we have no problem with them

4    reviewing his testimony.

04:21:05    5              THE COURT: All right.  I'm going to grant the review

6    of the testimony.  I hear it's just 20 pages.  So they would

7    like it read back, and I send the court reporter in, but they

8    said they're going to deliberate until 5:00 this afternoon.  And

9    they said they would like to have it tomorrow morning.

04:21:19   10              So they're getting here at 9:30.  So I'll ask our

11   court reporter, if you would then, at 9:30 to go into the jury

12   room and read it back, aside -- well, so the Government's

13   objection is overruled.

14              Any objection by the defense?

04:21:38   15              MR. FERRARI:  No, your Honor.

16              THE COURT:  All right.  Then I'll write the answer

17   that it will be provided.

18              And Ellen, when you go back, say, if that's what

19   they want, it will be at 9:30 in the morning.

04:21:48   20              All right, off the record.

21        (Discussion off the record.)

22              MR. VARNADO:  Your Honor, if I may, if you're -- does

23   that mean you're going to provide the entirety of Agent

24   Wickman's testimony?

04:22:10   25              THE COURT:  That's right.  It's only 20 pages.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

1              MR. VARNADO:  All right, very well.

2              THE COURT:  All right.  It will be provided.  I've

3      signed it.  If you would, take it back in.

4                   So we're adjourned for the day.  They said

04:22:15    5      they're going to go to 5:00 o'clock, and they'll have nothing

6      else for us.  So we'll see you tomorrow at, I guess --

7                   What time, about 10:00 o'clock?

8                   All right.  Be on call for 10:00 o'clock in the

9      morning, okay, because they'll have it read to them at 9:30.

04:22:32   10      And 20 pages takes about 20 minutes, plus or minus.  So be ready

11      at 10:00 in the morning.

12                   I've got a sentencing at what, 9:45?

13              THE CASE MANAGER:  9:45.

14              THE COURT:  And that's it.

04:22:45   15                   All right.  So we'll see you tomorrow.

16          (Court recessed at 4:22 p.m.)

17          (Court resumed at 4:24 p.m.)

18              THE COURT:  All right, be seated.  Let's get on the

19      record again.

04:25:15   20                   What's your position?

21              MR. VARNADO:  I'm sorry for that, Judge.  In talking

22      with Ms. Dye, my understanding was that is just -- the 20 pages

23      is just Agent Wickman's testimony after the lunch break.  He

24      started testifying Tuesday afternoon.  He started at about 12:05

04:25:29   25      in the afternoon.  And so the Government's position is that the

1  entirety of his testimony should be provided.

2          THE COURT:  Wait.  He testified -- when did he start

3  testifying?

4          MR. VARNADO:  Tuesday afternoon.  And that's what

04:25:38  5  they've asked for.

6          THE COURT:  That's what they asked for.

7          MR. VARNADO:  To ensure that that's the entirety of

8  his testimony.  The 20 minutes is just his testimony after the

9  lunch break.  So he testified for an hour and then we had lunch.

04:25:47  10  Then he testified --

11          THE COURT:  Well, it says from Tuesday afternoon.  He

12  went on -- I assume we're going to play the whole thing back to

13  him.

14          MR. VARNADO:  That was my --

04:25:54  15          THE COURT:  That was my intention.  Well, again, I

16  know you object.

17              Any objection to that?

18          MR. FERRARI:  Your Honor, no objection.  If it's from

19  Tuesday afternoon, it's from Tuesday afternoon.

04:26:03  20          THE COURT:  That's right, Tuesday afternoon.  He went

21  on in the -- early afternoon and then we took a lunch break.  It

22  says afternoon.  We'll put the whole afternoon on.  If he

23  started at 12:05, I guess, that's when he started.

24              And I know you object to this being read back.

04:26:18  25              In its entirety, you still have no objection, I

1  assume?

2          MR. FERRARI:  No, your Honor.

3          THE COURT:  Okay.  All right.  Yes, the whole thing

4  will be read back.

04:26:24  5          How long is that -- well, so it takes awhile.

6  It's the easiest thing to do.  It's a short trial.  If they want

7  to do it, if anybody -- whatever questions they have, that ought

8  to resolve it.

9          How many pages total do we have, Gayle?

04:26:49  10          THE COURT REPORTER:  Maybe another 40.  Well, an hour

11  is usually about 40 pages.  So maybe a total of 60.

12          THE COURT:  Well, just read it back.  That's what they

13  want.  If there's any change, they'll let us know, okay?  And

14  that's it.  All right.  So it will all be read back.  It's the

04:26:58  15  easiest thing because they had multiple parts that they were

16  interested in.

17          As you know, the standard response is, you know,

18  if you will tell us what parts are in conflict, you know, we'll

19  be glad to get those portions for you; but their question was

04:27:16  20  plural.  And what is it, it's such a short trial, I think it

21  would be just as easy to read it back.

22          We had no objection from the defense.  As far as

23  the Government goes, if you're preserving your objection, to

24  that extent, of the former objection, it's overruled again.

04:27:32  25          Okay.  All right.  So let's do it all.

1           By the way, I will say this:  If at any time --

2    and I'm talking now to the court reporter -- the jury says that

3    they now have the information they want, then, certainly, you

4    don't have to continue to read the whole thing, if they're

04:27:53   5    looking for something.  All right?

6           MR. MC NABB:  Okay.

7       (Court recessed for the day at 4:27 p.m.)

8

9

10              C E R T I F I C A T E.

11

12      I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter, to

14   the best of my ability.

15

16   By: /s/*Gayle L. Dye*                    *01-17-2010*

17         Gayle L. Dye, CSR, RDR, CRR        Date

18

19

20

21

22

23

24

25

Gayle Dye, CSR, RDR, CRR - 713.250.5582